MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:     2014 ME 90
Docket:       Ken-13-439
Argued:       May 14, 2014
Decided:      July 10, 2014

Panel:        SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

## STATE OF MAINE

v.

## KARL V. KITTREDGE

SAUFLEY, C.J.

[¶1]  The focal issues in this appeal are (1) whether Karl V. Kittredge was in custody when two Maine State Police Troopers interviewed him at the probation office after his probation officer asked him to report there and (2) whether Kittredge's statements at that interview were made voluntarily.  Kittredge appeals from a judgment of conviction entered by the trial court (*Murphy, J.*) upon a jury verdict finding him guilty of theft by unauthorized taking or transfer (Class C), 17-A M.R.S. § 353(1)(A), (B)(4) (2013).  In addition to his challenge to the court's denial of his motion to suppress statements made during the police interview, Kittredge argues that the court improperly presented to the jury an uncharged count of theft by receiving stolen property, 17-A M.R.S. § 359 (2013), and that the evidence was insufficient to support his conviction.  We affirm the judgment.

## I. BACKGROUND

[¶2]   The record, viewed in the light most favorable to the jury's verdict, supports the following facts.  *See State v. Ormsby*, 2013 ME 88, ¶ 2, 81 A.3d 336, *cert. denied*,  --- U.S. ---, 188 L. Ed. 2d 457 (2014).  Sometime before June 2012, Kittredge installed a safe in the bedroom cupboard of the victim, who was his wife's friend, as a favor to the victim so that she could protect her prescription medications and other valuables.

[¶3]   On June 11, 2012, the victim had a bad migraine headache.  Kittredge's wife left the residence where she and Kittredge were staying to take the victim to the hospital.  Kittredge was on probation at the time, having pleaded guilty to multiple counts of burglary and theft in 2008.

[¶4]   After Kittredge's wife departed, Kittredge, his adult son, and the friend with whom Kittredge and his wife were residing had a conversation in which they discussed the fact that the victim had medications in her residence.  Kittredge's son then left and later called Kittredge to pick him up.  Kittredge and his friend, traveling in a white van, picked Kittredge's son up at or close to a vacant lot near the victim's residence.  When Kittredge stopped to pick up his son, he could see that his son was carrying the victim's safe in a bag.  Kittredge drove to his mother's house in Pittston, and Kittredge took some of the pills that had been in the safe.

[¶5]  When the victim came home, she found that her door had been pried open and her safe was missing.  The safe's contents were worth more than $1,000 and included medications, including oxycodone, jewelry, and cash.  Although the victim had a video security system in place, the videotape had been removed. Kittredge knew about the camera surveillance system because he had observed the cameras while at the victim's home.  Kittredge's son had never been in the victim's bedroom before, and the victim had not told him about the surveillance system.

[¶6]  Kittredge was charged by complaint in November 2012, and then by indictment in January 2013, with burglary (Class B), 17-A M.R.S. § 401(1)(A), (B)(4) (2013), and theft by unauthorized taking or transfer (Class C), 17-A M.R.S. § 353(1)(A), (B)(4).  He pleaded not guilty, and, for purposes of both the criminal case now on appeal and a separate motion to revoke his probation, he moved to suppress evidence of statements he made to law enforcement during an August 16, 2012, interview held at the probation office.

[¶7]  At the hearing on that motion, the court heard testimony from one of the two troopers who interviewed Kittredge and from Kittredge himself.  The court found the following facts, which are supported by testimony offered at the hearing. Kittredge's probation officer asked him to come to the probation office, and Kittredge complied with the request.  When he arrived, he met two state troopers who were in uniform and armed.  He went into a room with the two troopers, and

4

the three of them sat down. The troopers told him that he was not under arrest but that they would like to speak with him about something that had happened at the victim's apartment. No *Miranda* warnings were read to Kittredge. Kittredge was seated in front of a closed but unlocked door, and he knew that he was free to leave the room, though he was not sure that he would be allowed to leave the building. There was a recorder in plain sight, but, for reasons that cannot be determined, the recorder did not record the conversation.

[¶8] The troopers gave Kittredge some information about what they knew, and, at some point, Kittredge denied being involved. The troopers on more than one occasion told him that they had information from another witness that made them believe that he was not telling the truth. Kittredge broke down and said, "[T]hat friggen son of mine." He looked sad and said that he was the one who usually got in trouble. He then made incriminating statements. The entire interview lasted from forty-five minutes to an hour.

[¶9] Neither of the troopers made promises to Kittredge, though they suggested that Kittredge should cooperate because it might help him with the district attorney's office. They told him it was best to tell the truth. The troopers did not make threats, did not physically restrain Kittredge in any way, and did not make threatening gestures. Although the court did not make a finding on the

matter, Kittredge does not dispute that he left the probation office at the end of the questioning.

[¶10] The court determined that Kittredge spoke voluntarily and that *Miranda* warnings were not required because Kittredge was not in custody. Accordingly, the court denied Kittredge's motion to suppress.

[¶11] The court held a two-day jury trial in August 2013. The state trooper who testified at the suppression hearing also testified at trial. Among other things, he testified that Kittredge admitted to him that he had picked up his son, had driven to his mother's house in Pittston, had seen the victim's safe inside his son's duffel bag, and had taken oxycodone pills from the safe.

[¶12] The State also offered testimony from the victim, from a neighbor of the victim who saw the white van on June 11, 2012, and from the owner of a jewelry store where Kittredge's son pawned jewelry stolen from the victim. Kittredge offered the testimony of the friend who had been with him on June 11, 2012. Kittredge did not testify.

[¶13] After the evidence was presented, the State moved for the court to instruct the jury on a count for receiving stolen property as a lesser included offense. The court granted the motion over Kittredge's objection because theft by receiving stolen property is an alternative basis for a theft charge and is subject to consolidation pursuant to 17-A M.R.S. § 351 (2013). The jury found Kittredge not

guilty of burglary but guilty of both theft counts and determined that the property was worth more than $1,000. The court merged the two theft counts, resulting in a single conviction for theft by unauthorized taking or transfer. *See id.*

[¶14] After a sentencing hearing, the court sentenced Kittredge to five years of imprisonment, with all but forty-two months of that term suspended, to be served concurrently with the forty-two-month sentence that he was ordered to serve when the court determined that he violated the conditions of his probation by engaging in new criminal conduct after his 2008 convictions. The court further imposed a term of two years of probation and ordered Kittredge to pay $3,975.99 in restitution to the victim and twenty-five dollars to the victims' compensation fund. Kittredge timely appealed. *See* 15 M.R.S. § 2115 (2013); M.R. App. P. 2(b)(2)(A).

## II. DISCUSSION

### A. Motion to Suppress

[¶15] "We review the denial of a motion to suppress for clear error as to factual issues and de novo as to issues of law, and will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision." *State v. Diana*, 2014 ME 45, ¶ 11, 89 A.3d 132 (quotation marks omitted).

1.    Determination of Custody

[¶16]   Although a person ordinarily must invoke the Fifth Amendment privilege against compelled self-incrimination to receive the benefit of its protections, *see Minnesota v. Murphy*, 465 U.S. 420, 429 (1984), a "[s]tatement[] made by a person subjected to custodial interrogation who is not first given *Miranda* warnings [is] inadmissible against that person at trial," *State v. Nadeau*, 2010 ME 71, ¶ 53, 1 A.3d 445; *see Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966) (requiring law enforcement officers to warn individuals about pertinent constitutional rights before conducting a custodial interrogation).  Such warnings are "necessary only if a defendant is: (1) in custody; and (2) subject to interrogation." *Nadeau*, 2010 ME 71, ¶ 53, 1 A.3d 445 (quotation marks omitted).

[¶17]   There is no dispute that Kittredge was subject to interrogation.  Thus, the question presented is whether he was in custody.  "The determination of whether an individual was in custody is a mixed question of fact and law.  In reviewing a court's custody determination, we defer to the court's factual determinations, but we review de novo the determination of whether an individual was in custody." *State v. Lowe*, 2013 ME 92, ¶ 13, 81 A.3d 360 (quotation marks omitted).  If the trial court's findings, reached by a preponderance of the evidence, "are properly supported by competent evidence in the record, and neither party challenges those factual findings[,] [t]he question is whether those facts

demonstrate as a matter of law that a reasonable person in [the defendant]'s situation would have felt he or she was not at liberty to terminate the interrogation." *Id.* ¶ 14 (citation omitted) (quotation marks omitted); *see Ormsby*, 2013 ME 88, ¶ 11, 81 A.3d 336.

> A court will consider a number of factors to make this objective determination, including
>
> > (1) the locale where the defendant made the statements;
> >
> > (2) the party who initiated the contact;
> >
> > (3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);
> >
> > (4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;
> >
> > (5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;
> >
> > (6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);
> >
> > (7) whether the suspect was questioned in familiar surroundings;
> >
> > (8) the number of law enforcement officers present;
> >
> > (9) the degree of physical restraint placed upon the suspect; and
> >
> > (10) the duration and character of the interrogation.

*Lowe*, 2013 ME 92, ¶ 16, 81 A.3d 360 (footnote omitted) (quotation marks omitted). "The factors must be considered in their totality, not in isolation," *id.* (quotation marks omitted), and the State bears the burden of proof, *see Ormsby*, 2013 ME 88, ¶ 11, 81 A.3d 336.

[¶18] Analyzing these factors in the present case, several factors weigh against a finding of custody: the troopers told Kittredge that he was not under arrest; Kittredge did not manifest any belief that he was not free to leave; he was in a familiar building that he had been in before, though not necessarily in that particular room; only two law enforcement officers were present during the interview, *see, e.g.*, *State v. Glenner*, 513 A.2d 1361, 1362-63 (Me. 1986); he was under no physical restraint; and the interrogation lasted only forty-five minutes to one hour in an unlocked room without any additional coercive conditions, *see, e.g.*, *State v. Lagasse*, 575 A.2d 1224, 1225 (Me. 1990). The question, then, is whether the following facts nonetheless require a finding of custody: Kittredge made the statements at the probation office where he was required to report; his probation officer—not he—initiated the contact; and the troopers communicated to Kittredge that they had information suggesting that he was involved in a crime, which suggested that he was a focus of the investigation.

[¶19]  As did the trial court, we focus on Kittredge's contention that he was in custody because his probation officer asked him to come to the office.  The United States Supreme Court has considered whether a probation officer's request that a probationer attend a meeting results in the cooperating probationer being "in custody" at that meeting.  *Murphy*, 465 U.S. at 429-31.  In *Murphy*, the probation officer herself conducted the interview based on information she had received suggesting that the probationer had admitted to committing a rape and murder.  *Id.* at 423-24.  The probationer admitted during the interview that he had committed the rape and murder, and the probation officer informed the court, which issued an arrest and detention order.  *Id.* at 424.  The Supreme Court concluded that the probationer was not in custody when he confessed because he was not subject to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *Id.* at 430 (quotation marks omitted).[1]

[¶20]  The United States Court of Appeals for the Seventh Circuit similarly held that a probationer was not in custody when a probation officer arranged a

---

[1]  The Court further determined that, in the absence of custody, the probation officer's conduct did not generate a need for *Miranda* warnings because the degree of pressure placed on the probationer by the probation officer was inadequate to overbear his free will.  *Minnesota v. Murphy*, 465 U.S. 420, 431 (1984).  The Court observed that "probationers should expect to be questioned on a wide range of topics relating to their past criminality" and that a probation officer is a peace officer already known to be allied with other law enforcement officers such that calling the probationer in to speak does not amount to trickery.  *Id.* at 432.  The Court concluded that "any compulsion [the probationer] might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator."  *Id.* at 433.

meeting and informed the probationer that an agent from the Bureau of Alcohol, Tobacco, and Firearms would be at that meeting to talk to him about guns. *United States v. Cranley*, 350 F.3d 617, 618-20 (7th Cir. 2003). The court held, in affirming the trial court's finding that the probationer was not in custody, that it was relevant that the probation office did not share quarters with other law enforcement agencies. *Id.* at 619-20; *see also United States v. Guerrier*, 669 F.3d 1, 4-7 (1st Cir. 2011) (holding that the defendant was not in custody when his parole officer arranged a meeting and then interviewed him in an unmarked law enforcement vehicle with two law enforcement agents).

[¶21] In 2001, the Court of Appeals of Ohio considered facts nearly identical to those before us today. *State v. Scott*, 765 N.E.2d 930 (Ohio Ct. App. 2001). There, a probation officer asked a probationer to appear at her office. *Id.* at 932. A sergeant from a sheriff's department interviewed him there after telling him that he was not under arrest and that he would be free to leave after the interview. *Id.* at 932, 936. The probationer was not in any way restrained, and the interview lasted for less than a half an hour before the officer gave *Miranda* warnings. *Id.* The court held that the probationer was not in custody for purposes of providing *Miranda* warnings. *Id.* at 936.

[¶22] Thus, we conclude that the State's exercise of its authority to require a probationer to appear at a specific place to discuss matters related to his probation

does not, standing alone, place the probationer in custody. *See Murphy*, 465 U.S. at 429-31; *see also id.* at 433 (holding that a probation officer's interview of a probationer who is subject to probation revocation does not generate pressure comparable to the pressure of custodial interrogation). Consistent with the opinions of the United States Supreme Court and other jurisdictions, and in accordance with our own precedent governing custody determinations, we conclude, as did the motion justice, that the few factors that weigh in favor of a finding of custody are insufficient, without more, to establish that Kittredge was in custody. *See Lowe*, 2013 ME 92, ¶ 16, 81 A.3d 360 (listing factors). Although Kittredge was called in by his probation officer upon suspicion of criminal conduct and was met by two troopers who wanted to interview him, the troopers told him that he was not under arrest, he subjectively realized that he could leave the room, he ultimately left without arrest, the interview was held in a building that was familiar to Kittredge, he was not physically restrained, he was not threatened in any way, the door was unlocked, only two troopers questioned him, and they concluded the interview within forty-five minutes to one hour.

[¶23] Accordingly, the court did not err in determining that *Miranda* warnings were unnecessary because Kittredge was not in custody. Thus, Kittredge's statements obtained through the interview were not required to be

suppressed on that basis. We next consider whether the statements should nonetheless be suppressed because they were not made voluntarily.

2. Voluntariness

[¶24] A confession cannot be admitted in evidence unless the confession was given voluntarily, and the State has the burden to prove voluntariness beyond a reasonable doubt. *See Lowe*, 2013 ME 92, ¶¶ 20-21, 81 A.3d 360; *State v. Rees*, 2000 ME 55, 748 A.2d 976 (acknowledging that article I, section 6 of the Maine Constitution requires a higher standard of proof than the United States Constitution). "Because it is primarily a question of fact, the court's voluntariness determination is reviewed for clear error, although its application of the law to its factual findings is reviewed de novo." *Ormsby*, 2013 ME 88, ¶ 28, 81 A.3d 336.

[¶25] "A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." *State v. Mikulewicz*, 462 A.2d 497, 501 (Me. 1983); *see also State v. Nightingale*, 2012 ME 132, ¶ 33, 58 A.3d 1057, *cert. denied*, --- U.S. ---, 186 L. Ed. 2d 864 (2013). "A confession, otherwise freely and voluntarily made, is not vitiated by a promise of leniency unless such promise was the motivating cause of the confession." *State v. Tardiff*, 374 A.2d 598, 601 (Me. 1977); *see also State v. McCarthy*, 2003 ME 40, ¶ 12, 819 A.2d 335.

14

[¶26]  As described above, Kittredge was not in custody, and the troopers told him that he was not under arrest.  *See State v. Gould*, 2012 ME 60, ¶ 12, 43 A.3d 952.  The troopers made no effort to physically restrain or threaten him, and they did not "employ trickery or deception."  *State v. Poblete*, 2010 ME 37, ¶ 24, 993 A.2d 1104.

[¶27]  The crucial question is, therefore, whether the troopers' suggestion that Kittredge should cooperate because it might help him with the district attorney's office constituted an impermissible offer of leniency.  The following have been determined not to constitute impermissible offers of leniency:

- A suggestion that the State would get help for the defendant, *Gould*, 2012 ME 60, ¶ 13, 43 A.3d 952;

- A statement that "'[t]he more cooperative you are, the better things are for you,'" *Nadeau*, 2010 ME 71, ¶ 57, 1 A.3d 445;

- A statement that it would "'look better'" for the defendant to confess, *State v. Dion*, 2007 ME 87, ¶ 34, 928 A.2d 746;

- A suggestion that cooperation often results in favorable treatment with respect to obtaining less restrictive housing conditions in jail, *McCarthy*, 2003 ME 40, ¶¶ 2-3, 13-14, 819 A.2d 335; and

- An officer's sympathetic statement to a defendant who was an acquaintance, "'I'm with you,'" *State v. Schueler*, 488 A.2d 481, 484 (Me. 1985).

[¶28] As in these cases, the generalized and vague statements that Kittredge should cooperate because it might help him with the district attorney's office do not constitute impermissible offers of leniency. The court did not err in reaching its findings beyond a reasonable doubt or in concluding that the confession was voluntary. Accordingly, the court did not err in denying Kittredge's motion to suppress.

B.     Additional Theft Charge

[¶29] "The interpretation of a statute is a legal issue we review de novo." *State v. Jones*, 2012 ME 88, ¶ 6, 46 A.3d 1125. By statute, "[a]n accusation of theft may be proved by evidence that it was committed in any manner that would be theft under this chapter [17-A M.R.S. §§ 351 to 361-A (2013) (chapter 15)], notwithstanding the specification of a different manner in the complaint, information or indictment . . . ." 17-A M.R.S. § 351. This provision is "subject only to the power of the court to ensure a fair trial by granting a continuance or other appropriate relief if the conduct of the defense would be prejudiced by lack of fair notice or by surprise." *Id.* "If the evidence is sufficient to permit a finding of guilt of theft in more than one manner, no election among those manners is required." *Id.* "In construing the mandate of section 351, we have repeatedly held that the state is free to prove theft in a manner which differs from the specific manner recited in the indictment." *State v. Duval*, 666 A.2d 496, 497 (Me. 1995).

[¶30] The court, applying section 351, did not err in instructing the jury on an alternative basis for the theft charge. Receiving stolen property, 17-A M.R.S. § 359, a crime set forth in chapter 15 of Title 17-A, could be proved to the jury despite its omission from the indictment because the indictment did allege theft in a different manner—by unauthorized taking or transfer, *id.* § 353.

C.     Sufficiency of the Evidence

[¶31] "When determining whether the record contained enough evidence to support a criminal defendant's conviction, we view the evidence in the light most favorable to the State to determine whether the fact-finder could rationally find every element of the offense beyond a reasonable doubt." *State v. Sanchez*, 2014 ME 50, ¶ 8, 89 A.3d 1084 (quotation marks omitted).

[¶32] Here, there is competent evidence in the record that, viewed in the light most favorable to the State, could rationally support the jury's findings that the items stolen from the victim's apartment were worth more than $1,000 and that Kittredge "obtain[ed] or exercise[d] unauthorized control over" the victim's property with the intent to deprive her of it, 17-A M.R.S. § 353(1)(A), (B)(4), and "receive[d], retain[ed] or dispose[d] of" the victim's property, "knowing that it ha[d] been stolen, or believing that it ha[d] probably been stolen, with the intent to deprive [her] of the property," *id.* § 359(1)(A), (B)(4).

The entry is:

Judgment affirmed.

---

**On the briefs and at oral argument:**

Thomas J. Carey, Esq., Vienna, for appellant Karl Kittredge

Maeghan Maloney, District Attorney, Prosecutorial District IV, Augusta, for appellee State of Maine

Kennebec County Superior Court docket number CR-2012-948
FOR CLERK REFERENCE ONLY