MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2013 ME 92
Docket:        Oxf-13-4
Argued:        September 9, 2013
Decided:       October 31, 2013

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

STATE OF MAINE

v.

KRISTINA LOWE

SAUFLEY, C.J.

[¶1]    Eighteen-year-old Kristina Lowe lay in the hospital, sedated, frostbitten, immobilized, and severely injured when a Maine State Police trooper, without providing *Miranda* warnings, questioned her about the car accident that caused Lowe's injuries.  After a pause in the questioning, during which the trooper received more information about the crash, the trooper told Lowe that two of her friends who had been in the backseat of the car were dead, and that a fourth person was likely the front seat passenger.  The trooper urged Lowe to tell the truth about who was driving.

[¶2]  The State appeals from the order entered in the trial court (*Clifford, J.*) finding that, although Lowe's statements were voluntary, all statements after the pause in questioning would be suppressed because after that pause, Lowe became a suspect, was in custody because she reasonably did not believe that she was free to

terminate the interview and, consequently, should have been given *Miranda* warnings. Lowe cross-appeals from the determination that her statements were voluntary. We affirm the court's determinations related to custody and voluntariness.

## I. BACKGROUND

[¶3] Shortly after midnight on January 7, 2012, eighteen-year-old Lowe was badly injured in a single-vehicle accident. She and three other young people were in the car. She was taken by ambulance from Stephens Memorial Hospital to Maine Medical Center. Lowe was sedated with morphine and fentanyl for several hours at Stephens Memorial Hospital and while being transported to Maine Medical Center. She had suffered a compression fracture of her vertebrae, a broken nose, a possible concussion, multiple contusions, a lacerated knee, an abdominal injury, and frostbite from walking some distance in the snow with only one shoe on to seek help after the accident.

[¶4] Soon after Lowe arrived at Maine Medical Center, a Maine State Police trooper began to interview her. A State Police sergeant had contacted the trooper to ask that she interview Lowe. The trooper met with another State Police sergeant at the hospital and obtained the consent of the nurses to speak with Lowe. The trooper, who was in uniform and carrying a sidearm, asked Lowe's mother if she could speak with Lowe alone. Lowe's mother left the room. Present in the room

were Lowe, the trooper who was conducting the interview, a police sergeant, and nurses and other medical personnel who were in and out frequently to monitor Lowe's condition.

[¶5] The trooper took notes and tape-recorded her conversation with Lowe. The trooper told Lowe that she could stop the interview at any time, but she did not read *Miranda* warnings because she did not consider Lowe to be in custody. Lowe agreed to be interviewed. During the interview, despite being sedated and vomiting twice, Lowe appeared to understand the questions that were asked, and she gave appropriate answers.

[¶6] Lowe almost immediately asked about the two passengers in the backseat of the car, but the trooper did not respond to the question. Lowe said that she could not see those passengers after the accident and was unable to make any contact with them. Lowe said that she had lost her cell phone and therefore she and Jake, whom Lowe, at first, said was the driver, walked away from the car in order to get help.

[¶7] The trooper repeatedly asked Lowe to tell the truth, told her that the police had ways of finding out who was driving and who was not, and said that the investigation would continue beyond that night. Lowe asked if she was going to have to go to court, and the trooper again asked her to admit if she was the driver.

4

As the interview progressed, Lowe began to question whether Jake had been driving and said she was eighty percent sure that it had been Jake.

[¶8] The trooper then took a five-minute break and learned that two people had died in the accident. Upon returning to Lowe's hospital room, she informed Lowe that the police now believed that Jake may have been in the front passenger seat, not the driver's seat. In addition, the trooper told Lowe that her friends had died. Immediately thereafter Lowe cried uncontrollably and made inculpatory statements. After another pause, and without *Miranda* warnings, the trooper continued the interview for several minutes.

[¶9] In June 2012, Lowe was indicted on two counts of manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2012); two counts of aggravated criminal OUI (Class B), 29-A M.R.S. § 2411(1-A)(D)(1-A) (2012); and one count of leaving the scene of an accident that resulted in serious bodily injury (Class C), 29-A M.R.S. § 2252(5) (2012).

[¶10] Lowe moved to suppress all of the statements she made to the trooper on the grounds that they were not voluntary and were obtained while she was in custody but was not read *Miranda* rights. The court held an evidentiary hearing at which the trooper and four medical professionals testified, and several medical exhibits as well as a recording and a transcript of the interview were admitted.

[¶11]   The trial court entered an order in which it concluded that Lowe's responses were voluntary but that all statements after the pause in the interview would be suppressed.  The trial court reasoned that after the trooper discovered that the passengers had died, Lowe became a suspect, was in custody, and should have been given *Miranda* warnings.  With the consent of the Attorney General, the State appealed from the suppression of evidence.  *See* 15 M.R.S. § 2115-A(5) (2012); M.R. App. P. 21(b).   Lowe cross-appealed from the determination that her statements were voluntary.

## II.  DISCUSSION

A.      Standard of Review

[¶12]  "A trial court's factual findings on a motion to suppress are reviewed for clear error, while the ultimate determination of whether the statement should be suppressed is reviewed de novo."  *State v. Bragg*, 2012 ME 102, ¶ 8, 48 A.3d 769 (quotation marks omitted).

[¶13]   "The determination of whether an individual was in custody is a mixed question of fact and law.  In reviewing a court's custody determination, we defer to the court's factual determinations, but we review de novo the determination of whether an individual was in custody."  *State v. Jones*, 2012 ME 126, ¶ 21, 55 A.3d 432 (quotation marks omitted).

[¶14] Here, the trial court's findings are properly supported by competent evidence in the record, and neither party challenges those factual findings. *See id.* The question is whether those facts demonstrate as a matter of law that a reasonable person in Lowe's situation "would have felt he or she was not at liberty to terminate the interrogation." *Id.* ¶ 22.

B.     Custody Determination

[¶15] The State argues that the court's rationale for suppression constituted error because Lowe was not in custody when she confessed to being the driver. Specifically, the State contends that the trooper lacked probable cause to arrest Lowe, even after the break, until Lowe said that she remembered she was driving.

[¶16] "An interrogation is custodial if a reasonable person standing in the shoes of [the defendant] would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (alteration in original) (quotation marks omitted). For individuals whose mobility is limited for reasons unrelated to restraint by law enforcement, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). A court will consider a number of factors to make this objective determination, including

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;[1]

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*Jones*, 2012 ME 126, ¶ 22, 55 A.3d 432 (quotation marks omitted). The factors must be considered "in their totality, not in isolation." *Id.* (quotation marks omitted).

[¶17] Many courts have considered whether patients were in custody during hospital-room interrogations; overwhelmingly, they have held that voluntarily hospitalized patients are not in custody by virtue of that hospitalization. *See, e.g.,*

---

[1] Here, because Lowe was medically immobilized, her freedom to leave is equivalent to her freedom to terminate the interview. *See Florida v. Bostick*, 501 U.S. 429, 436 (1991).

*United States v. Martin*, 781 F.2d 671, 672-73 (9th Cir. 1985) (holding that a defendant was not in custody when he went to the hospital after an explosion in his apartment, had received Demerol, appeared to be groggy but was coherent, asked and answered questions, and spoke with a local police detective and a special agent); *State v. Melton*, 476 N.W.2d 842, 843-45 (Neb. 1991); *State v. Cain*, 400 N.W.2d 582, 584 (Iowa 1987); *see also* Wayne R. LaFave et al., *Criminal Procedure* § 6.6(e) nn. 71, 74 (2012) (citing cases). Even where a patient had multiple fractures and was administered pain medication, the Supreme Court of Connecticut held that he was not in custody because he had been immobilized for treatment, not interrogation; he was not especially vulnerable due to age or intelligence; and a nurse indicated that he was capable of speaking with the police. *State v. Jackson*, 40 A.3d 290, 296, 310-13 (Conn. 2012).

[¶18] Moreover, a determination that a person is in custody requires more than that the hospitalized person is a focus of the investigation. *See State v. Warrior*, 277 P.3d 1111, 1126 (Kan. 2012) ("[T]he fact [that] a suspect is the focus of an investigation, standing alone, does not trigger the need for *Miranda* warnings."). To create custody, additional police conduct is necessary. *See, e.g., State v. Stott*, 794 A.2d 120, 133-35 (N.J. 2002) (holding that a patient in a psychiatric hospital was in custody when he was singled out for a recorded

interrogation in a secluded basement area on two separate days by a total of four law enforcement officers).

[¶19] Here, the court properly determined that the hospitalization did not, in itself, create a custodial situation and that the question was whether Lowe felt free to stop answering questions. Considering all of the *Jones* factors and the circumstances present, the trial court did not err in determining that Lowe was in custody after the pause in the interview. When the trooper took a break to confer with the investigators, she gained sufficient information to consider Lowe a suspect in a criminal case. Consequently, the trooper's questioning became more focused, aggressive, and insistent. She told Lowe that Jake was not likely the driver. She urged Lowe to tell the truth. She did not repeat that Lowe was free to stop speaking. Along with the exclusion of Lowe's mother from the room, when the trooper told Lowe that the backseat passengers had died, the trooper conveyed to Lowe that she should consider herself the focus of a criminal investigation. Viewed objectively, the information that the trooper learned during the break and communicated to Lowe produced a change in Lowe's liberty to end the interview. A reasonable person in Lowe's position would not have felt at liberty to end the interrogation. Accordingly, we affirm the determination that Lowe was in custody after the pause in the interview.

C.    Voluntariness Determination

[¶20]    Lowe contends that, given her medical treatment, sedation, and emotional distress, the evidence was insufficient for the court to find beyond a reasonable doubt that Lowe's statements were voluntary.  "[I]n order to find a statement voluntary, it must first be established that it is the result of [the] defendant's exercise of his own free will and rational intellect."  *State v. Caouette*, 446 A.2d 1120, 1123 (Me. 1982).

[¶21]    We review findings of fact for clear error and legal conclusions de novo.  *State v. McCarthy*, 2003 ME 40, ¶¶ 11, 12, 819 A.2d 335.  We will not disturb the motion court's determination that the State proved, beyond a reasonable doubt, that a confession was voluntary "if there is evidence providing rational support for [its] conclusion."  *State v. Cyr*, 611 A.2d 64, 66 (Me. 1992) (quotation marks omitted); *see Caouette*, 446 A.2d at 1124.

[¶22]    A statement may be voluntarily made even if the defendant was injured, medicated, or in distress.  *See State v. Philbrick*, 481 A.2d 488, 494 (Me. 1984) (upholding the voluntariness of a confession made while the defendant was traumatized from the victim's shooting); *see also State v. Lockhart*, 2003 ME 108, ¶ 33, 830 A.2d 433 ("The fact that an individual is mildly sedated does not, standing alone, establish that any statement he or she makes is no longer the product of a free will and rational intellect."); *State v. Bleyl*, 435 A.2d 1349, 1360

(Me. 1981) ("The fact that a person being interrogated in custody is under the influence of drugs does not, in itself, render a confession involuntary.").

[¶23]  A judge may conclude that, despite those circumstances, the statements were, beyond a reasonable doubt, made in "exercise of [a defendant's] own free will and rational intellect." *Caouette,* 446 A.2d at 1123; *cf. Martin*, 781 F.2d at 673-74 (affirming finding by a preponderance of the evidence that a defendant who was injured but awake and relatively coherent voluntarily spoke with police in the hospital).

[¶24]  Here, the court found that Lowe spoke with the trooper voluntarily. This finding is supported not only by the trooper's testimony but also by that of the nurse who attended to Lowe during the interview.  The nurse testified that she monitored Lowe to determine whether she was intoxicated, drowsy, emotionally overwhelmed, or otherwise at medical risk from speaking with police.  The nurse was present periodically throughout the interview and did not observe Lowe presenting slurred speech, drowsiness, or difficulty answering questions.  A nurse from Stephens Memorial Hospital also testified that Lowe was alert and oriented when in her care after the accident, and the paramedic who attended to her while she was transferred to Maine Medical Center testified that Lowe was aware of what was going on around her.  The recording of the interrogation supports the nurses' and paramedic's opinions.

[¶25]  Thus, despite Lowe's medical condition at the time of the interview, we affirm the court's determination that the statements were made voluntarily.

### III.  CONCLUSION

[¶26]  We conclude that the court did not err in finding that Lowe's statements throughout were voluntary and that Lowe was in custody after the break in the interview.

The entry is:

> Order suppressing evidence affirmed.

---

**On the briefs:**

Norman R. Croteau, District Attorney, and Joseph M. O'Connor and Richard R. Beauchesne, Asst. Dist. Attys., Office of District Attorney, South Paris, for appellant State of Maine

James P. Howaniec, Esq., Lewiston, for appellee Kristina I. Lowe

**At oral argument:**

Richard R. Beauchesne, Asst. Dist. Atty., for appellant State of Maine

James P. Howaniec, Esq., for appellee Kristina I. Lowe

Oxford County Superior Court docket number CR-12-162